### ADRIAN V. BAILEY v. GEORGE C. SWALLOW and Another.[1]

May 11, 1906.

Nos. 14,739—(60).

**Master and Servant.**

A platform built upon piling at the edge of a lake, upon which workmen are directed to carry on the operations of unloading logging cars, is an appliance or place, within the rule requiring the master to furnish a reasonably safe place for his employees to carry on their work.

**Vice Principal.**

Under the evidence the general manager and the foreman in charge of the local camp and the logging operations were vice principals, and a promise by them to repair the defective platform was binding upon the master.

[1] Reported in 107 N. W. 727.

**Finding.**

The evidence was sufficient to sustain a finding that the work of repairing the platform was not delegated by the master to respondent or his co-employees.

**Assumption of Risk.**

The evidence does not conclusively show that respondent did not rely upon the promise of the vice principals to repair the platform, or that in the course of the work he, with his co-employees, had assumed to make such repairs as were needed.

Action in the district court for St. Louis county to recover $30,567 for personal injuries. The case was tried before Cant, J., and a jury, which rendered a verdict in favor of plaintiff for $5,500. From an order denying a motion for judgment notwithstanding the verdict or for a new trial, defendants appealed. Affirmed.

*Washburn, Bailey & Mitchell,* for appellants.

*John Jenswold, Jr.,* for respondent.

LEWIS, J.

Appellants were engaged in the logging business, and one of their principal camps, known as "Camp Hoist," was located at Basswood Lake, where the logs were collected, loaded on logging cars, and transferred on a logging railroad a distance of about four miles to Fall Lake, and there unloaded. A large number of men were employed, some of them engaged in rafting, others in loading logs on the cars, and a train crew operated the logging train between the two lakes. Other men were employed in unloading the cars at Fall Lake, but all the men had their headquarters at Camp Hoist, where they slept and took their meals. Camp Hoist was in charge of a foreman, and, with other logging camps belonging to appellants, was under the management of a vice principal named Shoop. Part of the time respondent, with two and sometimes four other men, was engaged in unloading logs at the Fall Lake landing, and while in the performance of such duties was injured by the falling logs while tripping the chain which held the logs in place on one of the cars. This action was brought to recover damages for his injuries, basing appellants' liability upon the ground that the platform, or landing, upon which it was necessary for respondent to stand, was out of repair and defective, and upon the further ground

that the master, through the vice principals, Shoop and Coyle, promised to repair the same after their attention was called to the unsafe condition.

The claim was resisted upon the ground that it was not appellants' duty to keep the platform in repair, but that such work was the duty of the men engaged at that point in unloading the logs, and that appellants performed their duty with respect thereto in furnishing men with proper tools and materials with which to make such repairs. Further, it being a continuing duty on the part of the men to inspect and repair the landing, the promise of the vice principal, or foreman, if any such promise was made, was without authority.

The trial resulted in a verdict for respondent, and upon this appeal appellants insist that they were entitled to judgment in their favor notwithstanding the verdict.

The landing in question consisted of a platform about three hundred fifty feet long, extending into the lake and resting on piling, and sufficiently wide so that a track was laid at one side over its entire length, for the purpose of running a train of logging cars thereon. On one side of the track cross-timbers were placed on the piling, upon which, and parallel with the track, were laid a line of timbers the entire length of the platform; the line next to the track about a foot higher than those on the outside. A floor about five and a half feet wide was laid on the cross-timbers, constructed by placing poles parallel with the track. The railroad track was so constructed that the rail next this platform was five or six inches lower than the outside rail, so that when the logs were unloaded they would more easily roll off the cars. In order that the logs might be carried from the cars, over the floor and into the lake, at least two skids, notched at the outer end, were used for each car, and when in place were about a foot higher at the end near the car so that the logs would naturally roll along the skids into the lake. In unloading the cars it was customary for the employees to stand on the platform, properly arrange the skids on the line of timbers opposite the car to be unloaded, and then attach a jerk chain, thirteen to fifteen feet in length, to a hook in the chain wrapped around the logs on the car, step back to the end of the chain and towards the end of the car, and then jerk the hook out, immediately jumping out of the way of the released logs.

Respondent claims that on the day of the accident he was engaged in the usual course of his duties in unloading one of the cars as aforesaid, and that immediately after jerking the logs loose he attempted to jump back out of their way, but his foot caught in a hole in the platform and the logs rolled on him, dragging him into the lake and causing his injuries. The evidence in support of respondent's case is to the effect that, although he knew there was a hole in the platform at about the place where he stepped through, it was covered with bark at the time of the accident, and he did not see it; also that on the previous day he had complained to the foreman, Coyle, and before that to the general manager, Shoop, that the platform was generally in bad shape, full of holes, and in need of repair, and that he would not continue to work there unless it was put in order. It was shown that in response to his complaint both Coyle and Shoop promised to have the platform repaired, but failed to do so; and that in the afternoon following such promise to repair respondent received the injuries.

If respondent and his co-employees were engaged by appellants for the specific work of unloading cars as they came into the landing, and it was not made their special duty to keep the landing in repair, then we find nothing in the case to relieve appellants from the duty which rested upon them to furnish the workmen a suitable place to carry on their work. It is evident that, unless their attention was directly called to it and it was made a part of their work, they would not be called upon to take the time from their immediate work of unloading to make necessary repairs. The evidence is sufficient to sustain respondent's claim that no such work was ever delegated to him or his co-employees with his knowledge.

Respondent admitted that after being at work he discovered that the flooring of the platform was not in a safe condition, that the poles of which it was formed were old and not laid closely together, and that some of them had been broken from time to time by falling logs; and hence appellants contend that if he continued to work there, knowing it to be dangerous, he assumed the attendant risk. The testimony is sufficient to support respondent's claim that after discovering the unsafe condition of the platform he reported it to the immediate foreman and also to the general manager, and remained at work only because of the promises that it would be repaired.

The facts in this case do not come within the rule that it is not the master's duty to repair defects arising by reason of the work as it progressed, and for which repairs proper and suitable materials are supplied, and which do not require the help of skilled mechanics. The duty of furnishing a reasonably safe platform upon which respondent was put to work originally rested upon the master, and so remained unless the workmen were required to look after it and keep it in repair as a part of their employment. The rule is not changed by the fact that it was not a difficult matter to replace the broken poles, and that material for so doing was at hand. The evidence tends to show that respondent did make new skids, as required; but those were broken or lost in their direct use, and the work required that they be replaced. It was different with the platform, which was a completed instrument, supposed to be safe when respondent was invited to work upon it. Coyle was evidently a vice principal, and it was within his general authority as such to see that the landing was in proper repair, and consequently he represented appellants in that respect, and was not a fellow servant while engaged in making such repairs. It was proper to prove the general condition of the entire platform as bearing upon its safety, whether it needed repair, and whether the foreman had promised to repair it.

It was competent for the witness Trumbell to testify as to the length of the jerk chain, not because any negligence was predicated upon the fact that the chain was not long enough, but in reference to the way the injury occurred, and that it was necessary for the operator to quickly get out of the way of the logs. The witness Mayne, another employee, testified that he called Coyle's attention to the condition of the platform several days before the accident. It was proper to thus show that the foreman in charge had notice of the defective condition. Evidence was offered on the part of appellants that in prior years the men in charge of unloading operations were required to repair the dock as the work progressed. Such evidence could have no bearing on the issue in this particular case; for, as before stated, if respondent was employed for the specific work of unloading, he had a right to assume that the master would furnish him a suitable place to do his work. No prejudicial errors.

Order affirmed.